J-A20010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.E.B.-H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 976 EDA 2022 |

Appeal from the Decree Entered March 11, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at No(s):
CP-51-AP-0000714-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.Q.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 977 EDA 2022 |

Appeal from the Decree Entered March 11, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at No(s):
CP-51-AP-0000715-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 978 EDA 2022 |

Appeal from the Decree Entered March 11, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at No(s):
CP-51-AP-0000716-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.H., FATHER | : | |
| | : | |

J-A20010-22

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>No. 988 EDA 2022</td></tr>
</table>

Appeal from the Order Entered April 11, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at No(s):
CP-51-DP-0001008-2020

| IN THE INTEREST OF: M.Q.H., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 989 EDA 2022 |

Appeal from the Order Entered April 11, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at No(s):
CP-51-DP-0001009-2020

| IN THE INTEREST OF: M.H., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 990 EDA 2022 |

Appeal from the Order Entered April 12, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at No(s):
CP-51-DP-0000520-2020

BEFORE:   BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED NOVEMBER 16, 2022**

---

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

M.H. ("Father") appeals from the decrees entered on March 11, 2022, which granted the petitions filed by the Philadelphia Department of Human Services ("DHS") for the involuntary termination of Father's parental rights to his minor children, M.E.B.-H. (born in December of 2016), M.Q.H. (born in May of 2018), and M.M.H. (born in April of 2020) (collectively "the Children"), pursuant to sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1]   Father also appeals from the orders entered on April 11 and April 12, 2022, which changed the permanency goals for the Children from reunification with Mother and Father to adoption.[2, 3]   After careful review, we affirm in part, vacate in part, and remand with instructions.

We reproduce the following factual background and procedural history of this matter, as summarized by DHS:

> [DHS] first learned of the family in 2016[,] after [it] received a General Protective Services (GPS) report that Mother had tested positive for Percocet at the time of M.[E.B.-]H.'s birth[, i]n December [of] 2016.  DHS continued to monitor and stay involved with the family over the next few years.

---

[1] Decrees involuntarily terminating the parental rights of T.B. ("Mother") were entered on the same date; however, Mother has not filed an appeal.

[2] Mother has not filed an appeal from the April 11 and April 12, 2022 permanency review orders.

[3] By *per curiam* order entered May 9, 2022, this Court *sua sponte* consolidated the appeals at Nos. 976, 977, 978, 988, 989, and 990 EDA 2022, as these matters involve related parties and issues.

M.M.H.[, born in April of 2020,] suffered withdrawal symptoms from Mother's use of 20 drugs including amphetamines and spent a month in the hospital NICU. Father never once visited M.M.H. in the hospital. On May 8, 2020, M.M.H. was ready for discharge; DHS obtained an Order of Protective Custody (OPC) for M.M.H. and placed him in the care of his paternal aunt.[4] The trial court adjudicated M.M.H. dependent on June 10, 2020, with Father present.[5]

In August 2020, DHS learned that M.E.B.-H. and M.Q.H. lacked routine medical and dental care. On September 14, 2020, DHS filed urgent petitions for M.E.B.-H. and M.Q.H. On November 20, 2020, the court adjudicated M.E.B.-H. and M.Q.H. as dependent and committed them to DHS custody.[6] Father failed to attend the hearing.

DHS's Brief at 9-10 (citations to record omitted).

_____

[4] On May 18, 2020, the Community Umbrella Agency ("CUA") held an initial single case plan ("SCP") meeting, at which the following objectives were determined for Father: 1) comply with CUA services; 2) attend court hearings; 3) seek and attend anger management therapy; and 4) attend weekly, supervised visits with M.M.H. Father's Brief at 9. Father did not attend the SCP meeting. *Id.*

[5] At the June 10, 2020 hearing, Mother and Father were referred to the Achieving Reunification Center ("ARC") for parenting classes and employment assistance. The court further referred Mother and Father for domestic violence counseling, and Father was referred for anger management counseling. Father's Brief at 10.

[6] At the November 20, 2020 adjudicatory hearing, Father was "referred to ARC for parenting education, housing assistance, and employment services; ordered to sign releases and consents; and ordered to comply with the [Protection from Abuse ("PFA") order that Mother obtained against him]." Father's Brief at 14. Additionally, "Father was referred to [a Continuing Education Unit ("CEU")] for a dual diagnosis assessment and three random drug screens prior to the next court date[,] and ordered to engage in Menergy for domestic violence counseling." *Id.*

On November 29, 2021, DHS filed petitions to involuntarily terminate Father's parental rights to Children, along with petitions for a goal change to adoption. A combined hearing was held on these matters on March 11, 2022, at which DHS called multiple witnesses and Father testified on his own behalf. Following is a summary of the evidence produced at the hearing:

### 1. Incarceration

Father was incarcerated on firearms offenses in approximately September [of] 2021. Since being incarcerated, Father has not reached out to [the CUA] to have any telephone contact with M.E.B.-H. and M.Q.H. Nor has Father taken advantage of any programming offered at the prison to complete his case plan objectives.

### 2. Allegations of Domestic Violence

Father received domestic violence and anger management objectives because Mother made allegations of abuse against Father[,] and M.E.B.-H. stated she was scared of Father. Mother and Father continued to be in a relationship despite the ongoing domestic violence. Mother had a PFA [order] against Father at one point.

Father had multiple criminal charges for domestic violence, with Mother as the complainant. All charges were later withdrawn.

### 3. Father's Drug Use and Unemployment

[Father] has a history of drug use for which he has never received treatment. The trial court referred [F]ather for employment services but he never attended.

### 4. Lack of Reunification Efforts

At M.M.H.'s adjudication hearing, Father received his single case plan objectives for reunification. His case plan objectives included compliance with CUA case management and court orders, biweekly visits with M.M.H., weekly supervised visits with M.E.B.-H. and M.Q.H., compliance with [ARC] services, parenting, housing, employment, attendance at … Menergy, anger management, a [CEU] assessment for dual diagnosis,

three random drug screens prior to next court hearing, as well as a requirement to make his whereabouts known to CUA case management. Before his incarceration, CEU attempted to contact Father multiple times to assist him[,] but their efforts were unsuccessful.

To help him meet his objectives, Father also received a referral to ARC services in September 2020 for employment, parenting[,] and housing assistance. Father failed to respond to phone calls and text messages from the reunification intake specialist and as a result he was closed out for services the following month on October 30, 2020. [Natalie] Turner[, the case manager supervisor,] stated … that there had been no contact from Father regarding these objectives throughout the life of the case.

Father never attended ARC, never attended any other courses for parenting, housing[,] or employment and has not made any outreach to CUA to try to communicate any efforts towards these objectives. Father failed to receive any treatment for anger management and domestic violence. Father had 14 months prior to his incarceration to make progress toward his case plan objectives but he failed to do so.

At the termination of parental rights (TPR) hearing on March 22, 2022[, from] which the instant appeal arises, Father testified that he knew the objectives he needed to complete to begin the process of reunification. When asked why those objectives were incomplete, he said that he did not have time because he was "going through a lot." When asked why he never visited M.M.H., he responded "no comment." … Finally, when asked why he did not visit with M.E.B.-H. and M.Q.H., he stated that he was going through a lot[,] and he assumed they were taken care of. Father has failed to make any substantial reunification efforts.

**5. Minimal Parenting**

At the TPR hearing, the court heard detailed testimony regarding Father's lack of involvement in the Children's lives over the years. … Ms. Turner[] testified as the case manager supervisor for the life of the case. Ms. Turner stated that Father never took M.M.H. to any medical appointments and does not provide for him in any way. When M.E.B.-H. and M.Q.H. came into DHS['s] care, they were behind on medical and dental[ care,] and they did not become up to date with care until they were removed and placed with [their] maternal great grandmother.

Further, Father never had any visits with M.M.H.[,] nor has he had any telephone contact with him. As for M.E.B.-H. and M.Q.H., Father was supposed to have supervised visits with them[,] but his last visit was in 2020 at M.M.H.'s birth. Father has never provided financially for M.M.H., M.E.B.-H, and M.Q.H. Father has never sent cards, letters, or gifts to the three [C]hildren[,] and the [C]hildren do not ask to see him.

When Father had the opportunity to express any desire for reunification at the TPR hearing, he instead stated that he did not want to push the kids onto others….

**6. Children's Bond with Current Caregivers**

All three [C]hildren were in the care of trusted, DHS-approved relatives at the time of the TPR hearing. All of the Children are in pre-adoptive homes. M.M.H. had been living with [his] paternal aunt since his shelter care order on May 11, 2020. M.E.B.-H. and M.Q.H. were placed with [their] maternal great-grandmother since CUA received the case.

Ms. Turner testified at the TPR hearing that M.M.H. only recognizes [his] paternal aunt as his parent. Ms. Turner described their relationship as "loving, caring; he looks to her as a mother. He calls her mommy." When asked to explain who M.M.H. looks to when he's sick, hungry[,] and hurt, Ms. Turner testified that M.M.H. looks to [his] paternal aunt.

Paternal aunt takes M.M.H. to his medical appointments and provides financially for M.M.H. In later testimony, Ms. Turner testified that the only mother M.M.H. recognizes is [his] paternal aunt and that's who he calls ["]mom["]. As of March 10, 2020, M.M.H. was deemed by DHS to be in a safe home with his needs being met.

M.E.B.-H. and M.Q.H. have been with [their] maternal great grandmother for the life of the case. Ms. Turner was asked to testify to [the] maternal great grandmother's relationship with M.E.B.-H. and M.Q.H. When asked to describe the relationship, she described it as "loving and caring as well." When asked who they look to when they're sick, hungry[,] or hurt, Ms. Turner said [their] maternal great grandmother. Finally, when asked who takes the Children to their medical appointments, Ms. Turner said [the Children's] maternal great grandmother. On March 10, 2022, the trial court found that M.E.B.-H and M.Q.H. were in a

safe home with [their] maternal great grandmother, with their needs being met.

DHS's Brief at 10-15 (citations to record omitted).

At the conclusion of the hearing, the trial court found clear and convincing evidence to warrant the involuntary termination of Father's parental rights to the Children under 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b), and it entered decrees accordingly. The court further determined that a goal change to adoption was in the best interest of the Children; however, it appears that the trial court inadvertently entered orders on March 11, 2022, reflecting a continued goal of reunification. On April 11 and 12, 2022, the trial court entered amended permanency review orders to reflect its intended goal change to adoption.

On April 11, 2022, Father filed timely notices of appeal, along with concise statements of matters complained of on appeal, pursuant to 23 PA.C.S. § 2511(a)(2)(i). The trial court subsequently filed a notice of compliance with Pa.R.A.P. 1925(a), indicating that the reasons for its involuntary termination of Father's parental rights and changing the permanency goals to adoption were stated on the record at the March 11, 2022 hearing, and it attached a copy of the transcript accordingly. Father now presents the following questions for our review:

1. Whether the trial court erred by terminating the parental rights of [Father] under 23 Pa.C.S.[]§[]2511(a)(1)?

2. Whether the trial court erred by terminating the parental rights of [Father] under 23 Pa.C.S.[]§[]2511(a)(2)?

3. Whether the trial court erred by terminating the parental rights of [Father] under 23 Pa.C.S.[]§[]2511(a)(5)?

4. Whether the trial court erred by terminating the parental rights of [Father] under 23 Pa.C.S.[]§[]2511(a)(8)?

5. Whether the trial court erred by terminating the parental rights of [Father] under 23 Pa.C.S.[]§[]2511(b)?

6. Whether the trial court erred by determining it to be in the [C]hildren's best interest to change the goal from reunification to adoption?

Father's Brief at 5-6 (unnecessary capitalization and suggested answers omitted).

Father's first five issues relate to the trial court's termination of his parental rights. We review such a decree in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve

conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super.

2004). If competent evidence supports the trial court's findings, we will

affirm even if the record could also support the opposite result. *In re*

*Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights

is governed by section 2511 of the Adoption Act, which requires a bifurcated

analysis.

> Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511,

other citations omitted). The burden is upon the petitioner to prove by clear

and convincing evidence that the asserted grounds for seeking the

termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id.** However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id.** at 763.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, the trial court terminated Father's parental rights pursuant to sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we analyze the court's decision to terminate under section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the

- 11 -

incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S. [] § 2511(a)(2), the following three elements must be met:  (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical and mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In the case of an incarcerated parent, this Court has stated:

- 12 -

> [T]he fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children…. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.
>
> Thus, a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his … parental duties, to the child's right to have proper parenting and fulfillment of his … potential in a permanent, healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.

*In re B., N.M.*, 856 A.2d 847, 855-56 (Pa. Super. 2004) (internal citations and quotation marks omitted). "Thus, the fact of incarceration alone neither compels nor precludes termination of parental rights. Parents must still provide for the emotional and physical well-being of their children." *In re Z.P.*, 994 A.2d 1108, 1120 (Pa. Super. 2010). Moreover, we note that "[t]he cause of incarceration may be particularly relevant to the [s]ection 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were 'part of the original reasons for the removal' of the child." *Id.* (quoting *In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008)).

Instantly, Father claims that DHS failed to meet its burden to establish grounds for termination under section 2511(a)(2). Father's Brief at 25. In support of his argument, however, Father merely states that he "has

contacted the [C]hildren through their caregivers, has housing[,] and is willing to remedy the issues that brought the [C]hildren into care." *Id.* He does not provide any explanation for his lack of parental involvement with his Children prior to his incarceration or his failure to maintain a bond with the Children while incarcerated, nor does he explain how he plans to remedy any of the causes or conditions of his incapacity, abuse, neglect or refusal, which caused the Children to be without essential parental care. We remain unconvinced that Father is due any relief on this claim.

As DHS argues, Father has never acted as a father to the Children. DHS's Brief at 19. Although the Children originally entered care due to Mother's drug addiction, DHS notes that Father was unable to provide them with a safe home or parental care. *Id.* at 19-20. M.Q.H. and M.E.B.-H had not received routine medical care or immunizations since 2018, and both Mother and Father failed to address the behavioral health needs of M.Q.H. *Id.* at 20. Additionally, DHS indicates that Father did not respond to telephone calls from an intake specialist at ARC to set up services for housing and employment, nor has he attended any other courses for parenting, housing, or employment. *Id.* Prior to his incarceration, Father was unemployed and living with his uncle and his uncle's brother. *Id.* (citing N.T. Hearing, 3/11/22, at 85-86 (Father's testifying that if he were to be reunified with his Children, all the Children would stay in a bedroom with him in his uncle's apartment)). Father also failed to address domestic violence or substance abuse issues, despite Mother's PFA against him,

- 14 -

M.Q.H.'s fear of him, and referrals to Menergy and domestic violence courses. *Id.* In sum, DHS concludes that Father refused or was incapable of prioritizing reunification with his Children and that it would not be appropriate "to continue holding these [C]hildren's lives in abeyance waiting for Father to get his act together." *Id.* at 21. "Not only did Father refuse to obtain appropriate housing, … but he failed to attend parenting classes, failed to access employment assistance, failed to visit any of his [C]hildren, failed to talk with them on the phone, failed to attend drug treatment, and generally failed to comply with anything the trial court ordered." *Id.*

Moreover, it is clear that the trial court took into consideration Father's period of incarceration when considering termination under section 2511(a)(2); however, it emphasized that "for the first 14 months of this case, [F]ather was not incarcerated and there were no attempts by [F]ather to remedy any of the situations which led to the [C]hildren['s] being rendered dependent." N.T. Hearing at 95-96. Based on all the evidence presented, we conclude that the record supports the trial court's findings of clear and convincing evidence establishing that "the repeated and continued incapacity[, ab]use, neglect or refusal to parent has caused the [C]hild[ren] to be without essential parental care, control or subsistence necessary for [their] physical or mental well-being and [that] the conditions and causes of incapacity, abuse, neglect or refusal cannot or will not be remedied by [Father]." *Id.* at 95. As such, we discern no abuse of discretion or error of law in the court's termination of Father's parental rights under this section.

As for the trial court's analysis under section 2511(b), Father argues that the evidence presented by DHS "did not rise to the level of clear and convincing evidence" to prove that termination of his parental rights is in the best interests of the Children. Father's Brief at 27. However, in support of his claim, he merely states: "Father had telephone contact with the [C]hildren through telephone calls. When [F]ather is released he could continue to make the bond between the [C]hildren and [F]ather stronger." *Id.*

DHS counters that no bond exists between Father and the Children and that substitute caregivers currently perform all the parenting tasks for Children and provide them with love and affection. DHS's Brief at 26. As for Father's assertion that he could continue to strengthen his bond with the Children after his release from prison, DHS maintains that such a claim is "inappropriate and incredible. What matters is the bond Father has established during the Children's lives thus far," which is nonexistent. *Id.* DHS further explains:

> [T]he evidence established that there was no bond between Father and the Children. He has not visited with any of the Children during their time in care. He has spoken to the caregivers of the older children, but there is no evidence of any regularity and no testimony or other evidence of any other contact with the [C]hildren. The caseworker testified that there is no parent/child relationship between Father and the Children. Father has never provided financially for the Children and has never sent cards, letters, or gifts to the Children. The Children do not ask to see Father. Father failed to establish a bond with the Children prior to his incarceration, and the caseworker testified that even if he were to attempt to complete his

objectives after his release, they could not be completed within … any reasonable period of time given how long the Children have already been in care. The caseworker did not believe that terminating Father's rights would cause any irreparable harm to the Children.

Instead, the Children are bonded with their relatives who have been caring for them for their entire time in care. M.M.H. is with his paternal aunt (and has been there since his discharge from the hospital[] after being born exposed to drugs)[,] and the older two children are with [their] maternal great grandmother.

*Id.* at 25-26 (citations to record omitted).

DHS further suggests:

In addition to examining the existence of a parent-child bond, the trial court should also consider the "love, comfort, security, and stability" the [C]hildren might have with their resource parents. *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). Here, the Children are all in pre-adoptive homes, and it is the resource parents who have been providing for the day-to-day needs of the Children. The Pennsylvania Supreme Court stated in *In re[] T.S.M.* that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d [251,] 268 [(Pa. 2013)]. The caseworker testified that M.M.H. only recognizes [his] paternal aunt as his parent. Paternal aunt meets all of his needs[,] and he calls her "Mommy." M.E.B.-H and M.Q.H. have been with [their] maternal great grandmother for the life of the case. Their relationship is "loving and caring," per the caseworker. Maternal great-grandmother meets their daily needs[,] and they look to her for car[e] and support.

Terminating Father's parental rights would best serve the Children's needs and welfare by helping them achieve safety, stability, and permanency.

*Id.* at 26-27 (citations to record omitted).

After considering all the evidence presented, the trial court concluded "there's clearly no bond between the parents [and Children]. While they

- 17 -

may know who they are[, the court] question[s] whether they do.  And they certainly do not know them in the traditional sense of a mother and father because they've not been a mother and father to the [C]hildren since they were placed into the system and rendered dependent."  N.T. Hearing at 98-99.  Based on the foregoing, we deem the trial court's decision to terminate Father's parental rights under section 2511(b) to be supported by the record, and we discern no abuse of discretion or error of law.

Having determined that the trial court did not err in terminating Father's parental rights, we proceed with addressing the merits of Father's final issue pertaining to the permanency goal changes.  In doing so, we are guided by the following:

> In cases involving a court's order changing the placement goal …
> to adoption, our standard of review is abuse of discretion.  ***In re
> N.C.***, 909 A.2d 818, 822 (Pa. Super. 2006).  To hold that the
> trial court abused its discretion, we must determine its judgment
> was "manifestly unreasonable," that the court disregarded the
> law, or that its action was "a result of partiality, prejudice, bias
> or ill will."  ***Id.*** (quoting ***In re G.P.-R.,*** 851 A.2d 967, 973 (Pa.
> Super. 2004)).   While this Court is bound by the facts
> determined in the trial court, we are not tied to the court's
> inferences, deductions and conclusions; we have a "responsibility
> to ensure that the record represents a comprehensive inquiry
> and that the hearing judge has applied the appropriate legal
> principles to that record."  ***In re A.K.***, 906 A.2d 596, 599 (Pa.
> Super. 2006).  Therefore, our scope of review is broad.  ***Id.***

***In re S.B.***, 943 A.2d 973, 977 (Pa. Super. 2008).

Furthermore, this Court has stated:

> Placement of and custody issues pertaining to dependent
> children are controlled by the Juvenile Act[, 42 Pa.C.S. §§ 6301-
> 65], which was amended in 1998 to conform to the federal

- 18 -

Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

*In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006) (citations and footnotes omitted; emphasis in original). Additionally, we recognize that "the agency has the burden to show a goal change would serve the child's best interests…." *In re R.M.G.*, 997 A.2d 339, 347 (Pa. Super. 2010).

Specifically, section 6351 of the Juvenile Act provides direction to the court for the disposition of dependent children, stating in pertinent part:

**(f) Matters to be determined at permanency hearing.—**At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

…

(9) If a child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) The child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) The county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) The child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make

the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

> (i) The caregiver is following the reasonable and prudent parent standard; and

> (ii) The child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

…

**(f.1)    Additional    determination.—**Based    upon    the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

> (1) If and when the child will be retuned to the child's parent, guardian or custodian in cases where the return is best suited to the safety, protection and physical, mental and moral welfare of the child.

> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

> (3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

> (4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

…

**(f.2) Evidence.—**Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including

evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f), (f.1), (f.2), (g).

Additionally, this Court has provided further considerations that apply in goal change situations, stating:

Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. *In re N.C.*, *supra* [at] 826-27. Where a parent's "skills, including [his or] her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. *Id.* at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). *See also In re S.B.*, *supra* at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); *In re A.P.*, 728 A.2d 375, 379 (Pa. Super. 1999), *appeal denied*, 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

*In re R.M.G.*, 997 A.2d at 347.

Here, Father claims that the trial court erred in determining that a goal change to adoption is in the Children's best interest. Father's Brief at 27. He specifically disputes that reasonable efforts were made by DHS to finalize his permanency plan, asserting that the "CUA made no outreach to [him], did not send him updated single case plans[,] or arrange any physical, virtual[,] or telephone visits from August 2021 to the time of the hearing[.]" *Id.* at 28. Father further argues that he was willing to take parenting and other programs offered by the CUA, that he had housing and was to be released within four days of the hearing, and that he is willing to take the steps to remedy the condition that brought the [Children] into care once he is released from prison. *Id.*

Unfortunately, the trial court's pronouncement of its decision to change the permanency goals from reunification to adoption is devoid of any reference to the section 6351(f) and (f.1) factors, which the court is required to consider prior to making such determinations. *See* 42 Pa.C.S. § 6351(f) (listing the factors that a court shall determine at a permanency hearing); 42 Pa.C.S. § 6351(f.1) (providing additional determinations that the court is required to make "based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing"). In its notice of compliance with Rule 1925(a), the trial court directs us to the notes of testimony from the March 11, 2022 hearing for its statement of reasons for terminating Father's parental rights and changing the Children's permanency goals to adoption. *See* Notice of Compliance, 5/12/22, at 2 (citing N.T.

Hearing at 95-99). Our review of the transcript, however, reveals only the trial court's analysis under section 2511(a) and (b) pertaining to the termination of Father's parental rights, followed by a single statement that "it's in the best interest of these [C]hildren to have this goal changed to adoption." N.T. Hearing at 95-97. No explanation for the goal change has been provided. "Questions regarding the propriety of an order granting or denying a goal change petition are … discrete inquiries requiring an analysis of interests exquisitely separable from those interests reviewed in questions relating to the involuntary termination of parental rights." *In re R.I.S.*, 36 A.3d 567, 575 (Pa. 2011). Without a proper analysis of the relevant section 6351(f) and (f.1) factors in support of the trial court's decision to change the permanency goals to adoption, our ability to perform appellate review is impeded. Thus, we are constrained to vacate the April 11 and 12, 2022 orders granting the goal changes, and we remand for an examination of the merits of the goal change petitions under the appropriate statutory provisions.

Accordingly, we affirm the March 11, 2022 decrees involuntarily terminating Father's parental rights to Children, we vacate the April 11 and 12, 2022 orders changing the permanency goals to adoption, and we remand with instructions consistent with this memorandum.

Decrees affirmed. Orders vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/16/2022</u>